[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-12408

_____

D.C. Docket No. 5:15-cv-01677-VEH

DONALD LARRY MARTIN,

Plaintiff-Appellant,

versus

SOCIAL SECURITY ADMINISTRATION, COMMISSIONER,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(September 7, 2018)

Before WILSON, JORDAN, and HIGGINBOTHAM,[*] Circuit Judges.

PER CURIAM:

_____
[*] Honorable Patrick E. Higginbotham, United States Circuit Judge for the Fifth Circuit, sitting by designation.

This case requires us to consider the boundaries of "payment based wholly on service as a member of a uniformed service" for the purposes of Social Security benefit calculations. We agree with the Social Security Administration's interpretation, and affirm the district court's decision.

## I.

Donald Larry Martin appeals from the Social Security Administration (SSA)'s decision to reduce his monthly retirement insurance benefits in accordance with the Social Security Act's "windfall elimination provision." Martin and the SSA disagree on whether he is eligible for an exception to the provision that would prevent the reduction of his benefits.

## A.

The Social Security Act does not distribute social security benefits as a flat percentage of a recipient's earnings. Instead, it adjusts benefits payouts so that individuals with lower "average indexed monthly earnings"[1] are entitled to a greater percentage of those earnings than those with higher earnings.[2] This allows

---

[1] "Average indexed monthly earnings" are calculated by taking into account a person's inflation-adjusted monthly earnings subject to Social Security taxes. *See Social Security Benefit Amounts*, Soc. Sec. Admin., http://www.ssa.gov/oact/cola/Benefits.html (last visited Aug. 23, 2018).

[2] 42 U.S.C. § 415(a)(1) (2018).

low-income workers to receive a higher return on their Social Security contributions than higher-income workers.[3]

Further, not all employment is subject to Social Security contributions. The statutory scheme distinguishes between "covered" and "noncovered" employment. Covered employment is subject to various Social Security taxes, and associated retirement benefits are calculated to account for average indexed monthly earnings in the manner we described.[4] Noncovered employment is exempt from Social Security taxes,[5] but many noncovered positions include a separate annuity or pension.

Taken together, these elements of the default Social Security plan mean that a person who worked in both covered and noncovered employment might doubly benefit. Such a person might receive a pension or annuity from a noncovered employer while simultaneously receiving higher-than-warranted Social Security benefits—since the percentage of average indexed monthly earnings to distribute would be calculated only on the basis of any income from covered employment.[6]

---

[3] *See* H.R. Rep. No. 103-670, at 125 (1994) (Conf. Rep.) ("[T]he weighted Social Security benefit formula . . . is intended to replace a higher proportion of wages for low-earning workers than for high-earning workers.").

[4] *See* 20 C.F.R. § 404.1001 (2018).

[5] *See* 42 U.S.C. § 410(a)(5); 20 C.F.R. § 404.1018.

[6] *See* H.R. Rep. 98-25, pt. 1, at 22 (1983) ("If the noncovered worker in addition is eligible for a heavily weighted social security benefit, through moonlighting or through a relatively short career under social security, his total retirement pension income will most likely greatly exceed that of a worker with similar earnings all under social security.").

The Act's "windfall elimination provision" helps eliminate the potential for double-dipping. It modifies the default formula to account for an individual who receives a monthly payment "based in whole or in part upon his or her earnings" for noncovered work.[7] Such an individual will receive a smaller percentage of average indexed monthly earnings than he or she would receive under the standard formula.[8]

There are some exceptions to the windfall elimination provision, however. Primarily relevant here is subsection 415(a)(7)(A)(III)'s exception for any "payment based wholly on service as a member of a uniformed service," which we will refer to as the provision's "uniformed services exception."[9] "[M]ember of a uniformed service" is not defined in the provision, but rather incorporates definitions from across the U.S. Code. In doing so, it encompasses members of the Army National Guard.[10]

**B.**

---

[7] 42 U.S.C. § 415(a)(7)(A); *see also* 20 C.F.R. § 404.213(a)(3).

[8] 42 U.S.C. § 415(a)(7)(B). Social Security retirement benefits cannot be reduced by more than half the monthly payment an individual receives based on his or her noncovered employment. *See id.*

[9] *Id.* § 415(a)(7)(A)(III).

[10] Section 415(a)(7)(A)(III) cross-references 42 U.S.C. § 410(m), which defines "member of a uniformed service" to include "any person appointed, enlisted, or inducted in a component of the Army . . . including a reserve component," and cross-references the reserve component definition in 38 U.S.C. § 101(27). In turn, that provision defines "reserve component" to include the Army National Guard of the United States. 38 U.S.C. § 101(27)(F) (2018).

At issue is how this statutory scheme applies to someone who served as a National Guard "military technician (dual status)," also known as a "dual status technician." Congress has provided for two types of technicians to provide support to National Guard units: dual status technicians and non-dual status technicians.[11] The two roles have similar job responsibilities,[12] both are supervised by military adjutants general,[13] and neither is subject to military discipline under the Uniform Code of Military Justice.[14] There are several relevant differences, however: only dual status technicians are required as a condition of employment to maintain membership in the Selected Reserve[15] and a specified military grade,[16] and to dress in uniform while performing technician duties.[17] Moreover, unlike non-dual status technicians, dual status technicians are "authorized and accounted for as a separate category of civilian employees" [18] and are exempt from the competitive service[19] and requirements for reductions in Department of Defense civilian personnel.[20]

---

[11] *See* 10 U.S.C. § 10216–17 (2018).

[12] 32 U.S.C. § 709(a).

[13] *See id.* § 709(d).

[14] *See Walch v. Adjutant Gen.'s Dep't of Tex.*, 533 F.3d 289, 296–97 (5th Cir. 2008).

[15] 10 U.S.C. § 10216(a)(1)(B). Unlike dual-status technicians, non-dual status technicians do not need to maintain membership in the Selected Reserve to continue their employment. *Id.* § 10217(a).

[16] 32 U.S.C. § 709(b)(3).

[17] *Id.* § 709(b)(4).

[18] *Compare* 10 U.S.C. § 10216(a)(2), *with* 10 U.S.C. § 10217(a).

[19] *See* 32 U.S.C. § 709(e).

[20] 10 U.S.C. § 10216(b)(3).

Despite these differences, a dual status technician is "assigned to a civilian position as a technician,"[21] and consistently referred to as a civilian employee.[22]

## C.

Martin was a National Guard dual status technician from 1982 to 2005, and a member of the Alabama Army National Guard during the same time period.[23] In his administrative hearing in this case, he stated that "[o]n [the] weekend [he] was treated just like a soldier in the Alabama National Guard" and assigned to a military position. He further explained that he received "military pay" for his weekend drills with the National Guard and "federal civil service pay" for his weekday employment as a dual status technician. Neither his National Guard membership nor his employment as a dual status technician were covered employment for Social Security purposes.

In 2003, after Martin's National Guard unit was selected to go on a tour to Norfolk, Virginia, a doctor referred Martin to a medical board due to a prior asthma diagnosis. The medical board concluded that Martin was non-deployable, so Martin was transferred to a non-deployable unit and subsequently discharged on December 4, 2004.[24] Because he was no longer a member of the National Guard,

---

[21] *Id.* § 10216(a)(1)(C).

[22] *Id.* § 10216(a)(1), (a)(2).

[23] Martin's National Guard service began several years earlier, in 1977.

[24] There is some confusion in the record as to whether Martin was honorably discharged or transferred into the retired reserve, but the specifics do not affect this case.

the civil service also terminated him from his job as a dual status technician, effective April 9, 2005.

Martin was eligible for three different payments as a consequence of these events. First, he began receiving disability retirement payments from the federal civil service in 2005.[25] Second, he was eligible for military retired pay due to his National Guard service and prior active and inactive military duty in the 1970s, and began receiving those payments once he turned sixty in 2010. Finally, Martin was granted Social Security retirement insurance benefits in 2012 based on covered employment he had performed before the age of thirty-two.

Martin's Social Security retirement insurance benefits are at the heart of this case. The SSA determined that because Martin was also receiving civil service disability retirement payments, his Social Security benefits should be reduced under the windfall elimination provision. It correspondingly reduced his Social Security retirement insurance benefits from $658.90 per month to $439.20 per month. This reduction solely reflected Martin's receipt of the civil service payments; it did not take into account his military retired pay, as that was indisputably based on his performance of military duties.

Martin sought recourse against this determination from the SSA—requesting reconsideration from the SSA, a determination by an administrative law judge

---

[25] There also appears to be some confusion in the record as to whether these payments are connected to a pension or an annuity, but the answer similarly does not affect our opinion.

(ALJ), and review by the SSA Appeals Council[26]—and was denied at each step. Once he received the agency's final determination, he sought review from the district court, which agreed with the agency[27] and denied Martin's subsequent motion to amend its judgment. He timely appealed to this Court.

Martin's position is that any payments he now receives based on his employment as a dual status technician are "payment[s] based wholly on service as a member of a uniformed service," and are therefore subject to the uniformed services exception to the windfall elimination provision. As such, he claims that the disability retirement payments should not be taken into account to reduce his Social Security payments. In turn, the SSA claims that the uniformed services exception should not be construed to extend to dual status technician employment.

## II.

We review findings of fact by the Commissioner of Social Security for substantial evidence,[28] and review the Commissioner's legal decisions de novo.[29] We will therefore review the construction of the uniformed services exception de

---

[26] The Appeals Council denied Martin's request for review.

[27] *See Martin v. Berryhill*, No. 5:15-CV-01677-VEH, 2017 WL 818849 (N.D. Ala. Mar. 2, 2017).

[28] *See* 42 U.S.C. § 405(g) (2018).

[29] *See Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007).

novo, albeit potentially subject to the principles of deference we apply to an agency's statutory interpretation.[30]

## A.

At a minimum, we give an agency interpretation deference under *Skidmore v. Swift & Co.* corresponding to the "thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."[31] This recognizes an agency's specialized experience and information-seeking capacities, as well as the value of uniformity.[32]

If an agency's interpretation meets a certain threshold, we instead give heightened deference according to the two-step framework laid out in *Chevron, U.S.A., Inc. v. National Resources Defense Council, Inc.*[33] Under that framework, we must defer to an agency's reasonable interpretation of an ambiguous statute.[34]

## B.

Since *Chevron*, the Supreme Court has clarified what some refer to as "step zero" of *Chevron*[35]: the threshold requirement that an agency interpretation be of

---

[30] *See Arevalo v. U.S. Att'y Gen.*, 872 F.3d 1184, 1187 (11th Cir. 2017); *Stroup v. Barnhart*, 327 F.3d 1258, 1260 (11th Cir. 2003).
[31] 323 U.S. 134, 140 (1944); *see Buckner v. Fla. Habilitation Network, Inc.*, 489 F.3d 1151, 1155 (11th Cir. 2007).
[32] *See United States v. Mead Corp.*, 533 U.S. 218, 234–35 (2001) (discussing *Skidmore*).
[33] 467 U.S. 837 (1984).
[34] *Id.* at 842–43.
[35] *See* Cass R. Sunstein, Chevron *Step Zero*, 92 Va. L. Rev. 187 (2006).

the sort that warrants *Chevron* analysis in the first instance. Specifically, in *United States v. Mead Corp.*, the Court concluded that the principles underlying *Chevron* are only applicable where Congress explicitly or implicitly "expect[s] the agency to be able to speak with the force of law when it addresses ambiguity in the statute or fills a space in the enacted law," and the agency actually acts in line with that expectation.[36] This will frequently be apparent when the agency acts pursuant to its authority to engage in notice-and-comment rulemaking or formal adjudication on the topic, but those formal procedures are not universally necessary.[37] Importantly, even when an agency interpretation is not eligible for *Chevron* deference because it does not overcome step zero, it may still be entitled to *Skidmore* deference.[38]

The SSA's interpretation of the uniformed services exception appears in three different agency issuances. Most importantly, the agency issued an "acquiescence ruling" in response to *Petersen v. Astrue*,[39] an Eighth Circuit case holding that the uniformed services exception applies to dual status technicians.

---

[36] *Mead*, 533 U.S. at 229; *see Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016).

[37] *Mead*, 533 U.S. at 230 ("[T]he want of [notice-and-comment] procedure here does not decide the case, for we have sometimes found reasons for *Chevron* deference even when no such administrative formality was required and none was afforded . . . ."); *see also Barnhart v. Walton*, 535 U.S. 212, 222 (2002) ("In this case, the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the Agency has given the question over a long period of time all indicate that *Chevron* provides the appropriate legal lens through which to view the legality of the Agency interpretation here at issue.").

[38] *Mead*, 533 U.S. at 234–35 ("*Chevron* did nothing to eliminate *Skidmore*'s holding that an agency's interpretation may merit some deference whatever its form . . . .").

[39] 633 F.3d 633 (8th Cir. 2011).

10

This ruling—which was published in the "Notices" section of the Federal Register—lacks "the force and effect of the law or regulations," but binds internal components of the SSA.[40] It concluded that the SSA would only apply *Petersen*'s interpretation within the Eighth Circuit, and would continue to treat dual status technicians as ineligible for the exception everywhere else.[41] The agency's interpretation also appears in its "Program Operations Manual System" (POMS), which lays out internal procedures for the SSA.[42] Finally, it loosely appears within the SSA's discussion of its implementing regulation for the uniformed services exception.[43]

The parties seemingly agree that the SSA's interpretation, couched in these issuances, clears the "step zero" hurdle such that we should apply *Chevron*'s ordinary two-step process. Martin makes no argument that the SSA's interpretation does not speak sufficiently with the force of law to qualify for *Chevron* deference,

---

[40] *See Acquiescence Ruling Definition*, Soc. Sec. Admin., http://www.ssa.gov/regulations/def-ar.htm (last visited Aug. 23, 2018).

[41] *See* SSAR 12-1(8), 77 Fed. Reg. 51842 (Aug. 27, 2012), *as corrected by* 77 Fed. Reg. 54646 (Sept. 5, 2012) [hereinafter Acquiescence Ruling 12-1(8)].

[42] *See* Soc. Sec. Admin., Program Operations Manual System RS 00605.380: National Guard Civilian Pensions for Dual Status Technicians: *Petersen* Court Case, http://secure.ssa.gov/apps10/poms.nsf/lnx/0300605380 (last visited Aug. 23, 2018) [hereinafter Program Operations Manual System RS 00605.380] (explaining how to apply the windfall elimination provision to beneficiaries within and outside the Eighth Circuit).

[43] *See* 60 Fed. Reg. 56511, 56512 (Nov. 9, 1995) (stating that a pension based on inactive duty training after 1956 and before 1988 "has been the only kind of pension based on military service which caused a . . . modified computation under the windfall elimination provision").

and indeed appears to assume that the *Chevron* framework applies.[44] For its part, the SSA argues that any objections under *Chevron* step zero are waivable, and that Martin has waived them by failing to contest the applicability of *Chevron*. The district court analyzed the step zero issue and held that the SSA's interpretation was eligible for *Chevron* deference,[45] but acknowledged that it reached that conclusion in part because Martin had failed to contest the issue.[46]

This raises two unsettled issues. The first is whether "step zero" of *Chevron* is waivable—that is, whether the parties may agree that the court must grant *Chevron* deference if a statute is ambiguous and the agency's construction is reasonable, even if the agency interpretation would not ordinarily be eligible for *Chevron* deference under *Mead* and its progeny.[47] Other circuits have split on this issue, with some concluding that an objection to the *Chevron* framework is a non-

[44] Martin does briefly discuss *Barnhart*'s mandate that courts should consider a number of factors to establish whether "*Chevron* provides the appropriate legal lens through which to view the legality of the Agency interpretation." *See* 535 U.S. at 222. He does not discuss any of these factors in relation to the SSA's interpretation, however, and instead argues that *Chevron* deference is not warranted because the text of the uniformed services exception unambiguously supports his position.

[45] *See Martin*, 2017 WL 818849, at *9–11 (concluding that "Acquiescence Ruling 12-1(8), though not promulgated through notice-and-comment-rulemaking and without the full force and effect of law, is an authoritative, interpretive, and permissive construction of the Social Security Act that is entitled to deference").

[46] *Id.* at *10 n.7 ("Mr. Martin has made no argument that *Skidmore* is the more appropriate standard of deference. Accordingly, the Court has reviewed the Commissioner's interpretation within the *Chevron* rules of engagement.").

[47] In *Stroup v. Barnhart*, we considered a similar issue concerning a formally promulgated SSA regulation interpreting the windfall elimination provision. There, we proceeded with the relevant analysis under the Supreme Court's decisions in *Mead* and *Barnhart v. Walton*, despite noting that we reached our conclusion that the *Chevron* framework applied "[e]specially in the absence of any argument to the contrary." 327 F.3d 1258, 1261 (11th Cir. 2003). We did not address the issue of waiver outright.

12

jurisdictional argument that parties may waive,[48] and others analogizing *Chevron* deference to a standard of review that the court must independently assess.[49]

The second is whether, if we concluded that step zero is not waivable, the SSA's interpretation would meet *Mead*'s threshold requirement. The district court emphasized a number of aspects of the SSA's acquiescence ruling that appear to warrant deference, such as the intricacy of the statutory scheme the SSA must administer and the consistency of the SSA's interpretation.[50] But there are also several factors that counsel against granting the acquiescence ruling *Chevron* deference, like that the SSA disavows that its acquiescence rulings have the force of law, its relatively cursory rationale, and the lack of notice-and-comment procedure.[51] Further, while it is unclear whether the acquiescence ruling would

---

[48] *See, e.g.*, *Lubow v. Dep't of State*, 783 F.3d 877, 884 (D.C. Cir. 2015) ("Because the plaintiffs affirm the applicability of the *Chevron* framework, we need not consider potential arguments they might have made (but did not make) against our deferring to the agency under *Chevron* . . . . The applicability of the *Chevron* framework does not go to our court's jurisdiction, and a party can therefore forfeit an argument against deference by failing to raise it."); *Humane Soc'y of the U.S. v. Locke*, 626 F.3d 1040, 1054 n.8 (9th Cir. 2010) (observing in a footnote that because all parties agreed that *Chevron* deference applied, the court would assume the same without deciding the issue). Other circuits had recognized the possibility for waiver of similar issues before the Supreme Court clarified the "step zero" requirement in the early 2000s. *See Kikalos v. C.I.R.*, 190 F.3d 791, 796 (7th Cir. 1999); *Am. Auto. Mfrs. Ass'n v. Comm'r, Mass. Dep't of Envtl. Prot.*, 31 F.3d 18, 25–26 (1st Cir. 1994).

[49] *Sierra Club v. U.S. Dep't of the Interior*, Nos. 18-1082 & 18-1083, 2018 WL 3717067, at *17 (4th Cir. Aug. 6, 2018) ("We . . . must independently assure ourselves that any statutory interpretation provided by [the agency] qualifies for *Chevron* review and if not, whether it is entitled to a lesser form of deference, such as that afforded under *Skidmore*."); *Mushtaq v. Holder*, 583 F.3d 875, 876 (5th Cir. 2009) (rejecting *Chevron* deference even though both parties agreed it was appropriate, because "[a] reviewing court . . . may reject even an agreed standard").

[50] *See Martin*, 2017 WL 818849, at *9–11.

[51] While we have accorded *Chevron* deference to a published SSA regulation interpreting the Windfall Elimination Provision, *see Stroup*, 327 F.3d at 1261, we have not addressed what

13

qualify for *Chevron* deference under a step zero analysis, the POMS entry and regulation preamble are more plainly not *Chevron*-eligible.[52]

We do not need to unravel whether the parties can agree to bypass *Chevron* step zero or whether, if they cannot, the SSA's interpretation would survive that analysis. Instead, we conclude that even under *Skidmore* deference, the SSA has the best reading of the uniformed services exception.

## III.

The crux of Martin's position is that work as a dual status technician is "essentially military" in nature, and therefore his employment as a dual status technician was rendered "wholly . . . as a member of a uniformed service." After

---

deference to accord acquiescence rulings in particular. Illustratively, the Third Circuit recently held that a specific SSA acquiescence ruling was not entitled to *Chevron* deference because it did not undergo notice-and-comment procedures, lacked the force of law, and was relatively cursory, though the court declined to conclude that no acquiescence ruling could ever warrant *Chevron* deference. *Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 302–03 & n.19 (3d Cir. 2012).

The district court looked to a number of cases concluding that social security rulings should be entitled to *Chevron* deference even though they lack the force of law. *See Martin*, 2017 WL 818849, at *10 (citing *Garcia v. Sec'y of Health & Human Servs.*, 46 F.3d 552, 557 (6th Cir. 1995), and *Fair v. Shalala*, 37 F.3d 1466, 1469 (11th Cir. 1994)). While we agree that these cases bear on the question, we must also consider the Supreme Court's intervening dictates in *Mead* and *Barnhart*. In light of subsequent "step zero" caselaw, we do not think the cited cases decisively establish that the acquiescence ruling in this case is *Chevron*-eligible.

[52] Even though we gave *Chevron* deference to a published regulation construing the windfall elimination provision in *Stroup v. Barnhart*, we simultaneously implied that the SSA POMS, while persuasive, is not subject to the same deference, *see Stroup*, 327 F.3d at 1262, and the Supreme Court has implied the same, *see Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 385–86 (2003). As for the regulation preamble, it does not plainly exclude dual status technicians; at best, it provides support for the interpretation the SSA has established in the other documents.

14

parsing the provision's text, giving the SSA's interpretation the deference it is due under *Skidmore*, we cannot agree.

## A.

As we have observed, the SSA's interpretation is at least entitled to deference based on its power to persuade, accounting for the "thoroughness evident in its consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements."[53] This recognizes that informal agency interpretations "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance."[54]

Here, the SSA administers a "highly detailed" statutory scheme and "can bring the benefit of specialized experience to bear on the subtle questions in this case."[55] It previously considered the issue presented by Martin and resolved to preserve its longstanding interpretation of the provision based on its reading of the legislative history.[56] Further, the SSA POMS provides specific, detailed instructions on how to apply the SSA's interpretation, especially in light of the

---

[53] *Skidmore*, 323 U.S. at 140.

[54] *Id.*

[55] *Cf. Mead*, 533 U.S. at 234–35 (holding that Customs ruling letters were entitled to *Skidmore* deference for these reasons); *see also Barnhart v. Thomas*, 540 U.S. 20, 28–29 (2003) (referring to the Social Security hearing system as "probably the largest adjudicative agency in the western world"); *Schweiker v. Gray Panthers*, 453 U.S. 34, 43 (1981) (observing that the Social Security Act is "among the most intricate ever drafted by Congress").

[56] *See* Acquiescence Ruling 12-1(8), *supra*.

*Petersen* decision that governs claims by residents of the Eighth Circuit.[57] Taken together, these considerations reflect a carefully reasoned agency interpretation that meshes with the SSA's overall administration of the Social Security Act— exactly the type of interpretation that warrants a reasonable degree of deference under *Skidmore*. While this deference may not override our reading of the provision's plain meaning,[58] it will inform our interpretation of any text that is more difficult to untangle.

### B.

We begin with the text of the uniformed services exception.[59] We must first determine whether the uniformed services exception's language "has a plain and unambiguous meaning."[60] If the meaning of the exception is "inescapably ambiguous," we may look outside the statutory text to aid in our interpretation.[61]

In relevant context, the provision reads as follows:

> (7)(A) In the case of an individual whose primary insurance amount would be computed under paragraph (1) of this subsection, who—
>
>> (i) attains age 62 after 1985 (except where he or she became entitled to a disability insurance benefit before 1986 and remained so entitled in any of the 12 months immediately preceding his or her attainment of age 62), or

---

[57] *See* Program Operations Manual System RS 00605.380, *supra*.

[58] *See Riegel v. Medtronic, Inc.*, 552 U.S. 312, 326 (2008).

[59] *See Durr v. Shinseki*, 638 F.3d 1342, 1344 (11th Cir. 2011).

[60] *United States v. Williams*, 790 F.3d 1240, 1245 (11th Cir. 2015).

[61] *See id.* (observing that this includes the use of legislative history when necessary).

(ii) would attain age 62 after 1985 and becomes eligible for a disability insurance benefit after 1985,

and who first becomes eligible after 1985 for a monthly periodic payment ( . . . but excluding . . . (III) **a payment based wholly on service as a member of a uniformed service (as defined in section 410(m) of this title))** which is based in whole or in part upon his or her earnings for service which did not constitute . . . [covered employment], the primary insurance amount of that individual during his or her concurrent entitlement to such monthly period payment and to old-age or disability insurance benefits shall be computed or recomputed under subparagraph (B).[62]

We agree with Martin, and the SSA does not contest, that "wholly" has a plain meaning in this context—it means "to the full or entire extent" or "to the exclusion of other things."[63]

The word "service," in the first sense in which it is used in the provision, does not have a definite meaning in context. It could be taken to relate to employment generally, or it could be read to be specific to military membership.[64]

---

[62] 42 U.S.C. § 415(a)(7)(A)(III) (emphasis added).

[63] Webster's Third New International Dictionary 2612 (1961). Dictionary definitions are of course "not the end of plain meaning analysis," *People for Ethical Treatment of Animals, Inc. v. Miami Seaquarium*, 879 F.3d 1142, 1146 (11th Cir. 2018) (per curiam), and a battle of the dictionaries runs the risk of obfuscating a statute's plain meaning. But especially here, where a definition is not in serious dispute, a definition is helpful in sharpening our interpretation.

[64] *See, e.g.*, Webster's Third New International Dictionary, *supra*, at 2075 (offering two pertinent definitions of "service," one as "the performance of work commanded or paid for by another," and the other as "the performance of military duty, esp. in war").

17

Resolving this will not decisively clarify the provision's scope, however. If we read "service" in its broader sense to constitute employment, it will still be limited by the requirement that it be performed "*as* a member of a uniformed service," as we will explain. If we read it in its narrower scope to constitute solely military service, we must still determine what activities fall within the sweep of military service.

This brings us to the use of the word "as" to limit what service qualifies for the uniformed services exception. In the context of the requirement, "as" appears to limit the uniformed services exception only to payments for work performed in one's capacity or role as a member of the uniformed services.[65] As the SSA points out, if Congress had intended the uniformed services exception to cover *any* payments made to someone who had been a member of a uniformed service, it could have accomplished that objective much more simply by excepting payments "to" a member of a uniformed service or payments for service "by" a member of a uniformed service.[66] To put a finer point on the issue, it is not enough that Martin was a member of a uniformed service at the same time he performed the

---

[65] In context, we take "as" to mean something to the effect of "in the character, role, function, capacity, condition, or sense of." *Id.* at 125.

[66] *Cf. CSX Transp., Inc. v. Ala. Dep't of Revenue*, 888 F.3d 1163, 1176 (11th Cir. 2018) ("If Congress had intended for [the statute at issue] to cover a state's revenue expenditures, it easily could have written it to say so. It didn't."); *In re Appling*, 848 F.3d 953, 958 (11th Cir. 2017) ("If the statute applied only to statements that expressed a debtor's overall financial condition, Congress could have said so . . . . But Congress did not use this language . . . . [or other] phrases that would connote a full or complete expression of financial condition.").

18

noncovered employment at issue. Rather, the work for which Martin now receives civil service disability retirement payments—his employment as a dual status technician—must have been performed *in his role* as a member of a uniformed service.[67] On this point, too, there is no serious dispute between the parties.[68]

The controversy is ultimately over what it means to perform service *wholly* in one's capacity or role *as a member of a uniformed service*. The text of the uniformed services exception is of limited use here; while it cross-references and incorporates definitions across the U.S. Code, at bottom it only clarifies that members of the United States Army National Guard are "member[s] of a uniformed service." [69] It does not further define service performed as a member of the National Guard, and therefore does not resolve whether the civil service payments at issue were wholly for work Martin performed as a member of the

---

[67] Martin, citing *Social Security Board v. Nierotko*, 327 U.S. 358, 365 (1946), argues that "service" encompasses the entirety of the employer-employee relationship and not just the aspects of individual work done for the employer. That does not, however, resolve our question as to the nature of the compensated employment relationship at issue. Just because Martin was a member of the National Guard and also worked for the National Guard in his dual status technician capacity does not mean that both roles were performed in his capacity as a member of the Guard.

[68] Martin briefly appears to suggest that he is entitled to the uniformed services exception simply because he was a member of a uniformed service at the time he carried out his dual status technician responsibilities. In general, though, he argues from the premise that the dual status technician role was part and parcel with his National Guard service, and he does not dispute the SSA's characterization of the provision as only applying to payments for work performed in someone's *capacity as* a member of a uniformed service.

[69] As we have noted, 42 U.S.C. § 410(m) defines "member of a uniformed service" to include members of reserve components as defined in 38 U.S.C. § 101(27), which includes the Army National Guard of the United States. *See* 38 U.S.C. § 101(27)(F). This is not at issue in the case; the question is rather whether service as a National Guard dual status technician occurs as a member of the National Guard for the purposes of the uniformed services exception.

19

National Guard, or whether they were at least partially for work he performed outside of that role.

## C.

But we are not limited to the twenty-one words of the uniformed services exception. We must also look to Congress's conception of the dual status technician role, as evidenced by the rest of the statutory scheme.[70] Martin notes the many elements of the dual status technician role that appear to place it within the bounds of service as a member of the National Guard. Specifically, he observes that he was required to maintain membership in the Alabama National Guard to preserve his position as a dual status technician; that dual status technicians are "authorized and accounted for as a separate category of civilian employees";[71] that dual status technicians "shall only be reduced as part of military force structure reductions," in contrast to reductions in Department of Defense civilian personnel;[72] that Martin's job was administered by a military adjutant general;[73] and that military technicians may be employed in "the administering . . . or training of the National Guard."[74] These aspects led the district court and the administrative

---

[70] *See King v. Burwell*, 135 S. Ct. 2480, 2489 (2015); *see also Durr*, 638 F.3d at 1349 ("We do not look at one word or term in isolation, but instead we look to the entire statutory context." (alteration omitted)).

[71] 10 U.S.C. § 10216(a)(2).

[72] *Id.* § 10216(b)(3).

[73] 32 U.S.C. § 709(d).

[74] *Id.* § 709(a).

law judge to concede that the dual status technician role is "essentially military" in nature.[75]

Martin's work as a dual status technician was distinct from his National Guard service in important ways, though. Congress consistently refers to dual status technician employment as a civilian position.[76] Martin acknowledges that he performed his technician work during the work week for federal civil service pay, and took up his military position on the weekends for military pay. Now that Martin no longer serves in the National Guard or as a dual status technician, he receives separate military retired pay—including for his twenty-seven years of National Guard service—and civil service disability payments.[77] Even the use of the title "dual status" suggests that dual status technicians are employed not just in their capacity as members of the National Guard.

The critical issue is therefore how the word "wholly" interacts with the nature of the dual status technician position. By its plain meaning, "wholly" limits the payments covered by the uniformed services exception: even if dual status

---

[75] This tracks caselaw on other issues concerning National Guard technicians. *See, e.g.*, *Walch*, 533 F.3d at 297 ("Technicians have a dual status. It is not possible to disentangle for these purposes their military role and command structure from their civilian employment, such that suits under [42 U.S.C. §§ 1983 and 1985] or *Bivens* may proceed without raising the same concerns as when those claims are brought by traditional Guardsmen."). Importantly, as the district court observed, just because technician employment may be inseparable from military employment for certain purposes does not mean that it is *wholly* indistinguishable from military employment here.

[76] *See* 10 U.S.C. § 10216(a)(1)(C), (a)(2).

[77] As Martin explained at his hearing, "This [military retirement pay] included all my service, starting with my active duty, which included Vietnam 1970-'71, my inactive service from '71 to '76, and then my 27 years of National Guard service."

21

technician employment is *essentially* military, it is not subject to the uniformed services exception if it is not *wholly* military in nature. Accounting for all of the features of the dual status technician role, we find it difficult to conclude that a dual status technician wholly performs that role as a member of the National Guard.

## D.

Recognizing that the plain text of the provision itself is not necessarily determinative of what it means to perform service "as a member of a uniformed service," nothing Martin has presented extrinsic to the statutory scheme convinces us of his position. Martin urges us to consider several additional sources, but none of them indicate that the uniformed services exception covers payments for work performed as a dual status technician.

He emphasizes the contrasts between dual status technicians and other National Guard technicians, but this comparison does not sustain a conclusion that dual status technicians wholly perform their service as members of the National Guard. It is true that the role of "military technician (dual status)" is defined in a section of the U.S. Code separate from the section defining the role of "non-dual status technician," and that non-dual status technicians need not maintain membership in the National Guard or wear military uniform.[78] For all other

---

[78] *Compare* 10 U.S.C. § 10216, *with* 10 U.S.C. § 10217.

purposes, however, non-dual status technicians appear able to perform the same responsibilities as dual status technicians, [79] and they are "employ[ed] and administer[ed]" by the same adjutants general.[80]

Nor are other portions of the U.S. Code helpful in establishing the meaning of the uniformed services exception. Martin isolates the use of the phrase "based wholly on service as a member of a uniformed service" in 42 U.S.C. § 402(k)(5)(B)(i), which provides a similar exception to a provision reducing old age and survivor's insurance benefits, but that context does not bring information on its interpretation.[81] Martin also notes that "[f]ull-time National Guard duty" encompasses "training or other duty[ ] performed . . . in the member's status as a member of the National Guard,"[82] and that "training or duty" extends to "[s]upport of operations or missions undertaken by the member's unit at the request of the President or Secretary of Defense."[83] In context, this definition of "training or duty" only suggests that National Guard members may permissibly be called upon to perform tasks other than "assembl[ing] for drill and instruction . . . at least 48

---

[79] *See* 32 U.S.C. § 709(a) (laying out the relevant responsibilities for both roles, subject to the additional National Guard membership, military grade, and uniform requirements placed on dual status technicians).

[80] *See id.* § 709(d).

[81] Martin also cites the use of the phrase in 42 U.S.C. § 410(d)(2)(B), but that subsection does not exist, and the phrase does not appear anywhere in the surrounding subsections.

[82] 32 U.S.C. § 101(19).

[83] *Id.* § 502(f)(1)(2)(A).

times each year" and "participat[ing] in training . . . at least 15 days each year."[84] And, while "[s]upport of operations or missions undertaken by the technician's unit at the request of the President or the Secretary of Defense" is one of the "additional duties" that a National Guard technician may be called upon to perform,[85] it is not one of the technician's core duties—instead, employing a technician for operation or mission support is only permissible "to the extent that . . . [it] does not interfere with the performance" of those core duties.[86] This does not establish that work performed as a dual status technician constitutes work performed as a member of the National Guard.

Finally, Martin urges that the legislative history of the uniformed services exception brings evidence that Congress intended the exception to encompass employment like the dual status technician role at issue here. It does not. Rather, the legislative history only reflects an effort by Congress to harmonize the treatment of military pensions for active and inactive military service.[87] It does not

---

[84] Section 502(f)(1) specifically provides that "a member of the National Guard may[ ] . . . without his consent, but with the pay and allowances provided by law[,] or . . . with his consent, either with or without pay and allowances[,] be ordered to perform training or other duty in addition to that prescribed under subsection (a)." Subsection (a) lays out the National Guard's yearly drill and training requirements, as we have described. *See id.* § 502(a).

[85] *Id.* § 709(a)(3)(A).

[86] *See id.* § 709(a) ("[P]ersons may be employed as technicians in—(1) the organizing, administering, or training of the National Guard; (2) the maintenance and repair of supplies issued to the National Guard or the armed forces; and (3) the performance of the following *additional duties to the extent that the performance of those duties does not interfere with the performance of the duties described by paragraphs (1) and (2) . . . .*" (emphasis added)).

[87] *See* H.R. Rep. No. 103-670, at 125 ("Active military service became covered under Social Security in 1957. Inactive duty by reservists (such as weekend drills) became covered

24

show that Congress intended to exclude dual status technicians from the windfall elimination provision. The legislative history of the National Guard Technicians Act of 1968 also offers no special guidance; on one hand, Congress evidently recognized that the vast majority of technicians would be dual status and that the program would be "organized and operated along military lines,"[88] but on the other hand, it consistently emphasized that part of even a dual status technician's work would be *civilian* employment.[89]

∗ ∗ ∗

After using the interpretive tools at our disposal, we conclude—accounting for the unique nature of the dual status technician position and the deference we have determined we owe the SSA's interpretation under *Skidmore*—that Martin did not perform his dual status technician employment wholly as a member of a

---

under Social Security in 1988. A pension based on either type of service (active or inactive), if performed before 1957, does not trigger the WEP. The only military pension which triggers the WEP is a pension based on inactive duty after 1956 and before 1988 . . . . [Under this bill, an] individual's receipt of a pension based wholly on service performed as a member of a uniformed service, whether on active or inactive duty and whether performed prior to 1988 or not, would not trigger application of the . . . WEP to the individual's Social Security benefits."); *see also* H.R. Rep. No. 103-506, at 67 (1994) (explaining the same rationale and concluding that the prior system "produce[d] arbitrary and inequitable results for a small, closed group of people who receive military pensions based, at least in part, on noncovered military reserve duty after 1956 and before 1988").

[88] H.R. Rep. No. 90-1823, at 13 (1968).

[89] *See, e.g.*, *id.* at 2 ("The concept of the technician program is that the technicians will serve concurrently in three different ways: (*a*) Perform full-time civilian work in their units; (*b*) perform military training and duty in their units; and (*c*) be available to enter active Federal service at any time their units are called.").

uniformed service. As a result, payments based on that employment do not qualify for the exception.

## IV.

We recognize in reaching this result that we are at odds with the Eighth Circuit, which held in *Petersen v. Astrue* that the exception unambiguously applied to a dual status technician.[90] In doing so, the Eighth Circuit emphasized that dual status technicians are required to maintain National Guard membership and to wear uniforms while on duty, noting that these were "unique National Guard technician requirements" that a dual status technician performed in his work as a member of the National Guard.[91] It further rejected the SSA's proposal to read what the court referred to as a "military duty" requirement into the statute, noting that all the exception requires is that the service be conducted as a member of a uniformed service.[92]

For the reasons we have explained, we do not think the requirements of the dual status technician position are sufficient to place dual status technicians within the sweep of the exception—especially given the provision's use of the word "wholly." We agree with the Eighth Circuit that not all service performed "as a member of a uniformed service" must have characteristics of military *duty*. We

---

[90] *See Petersen*, 633 F.3d at 637.
[91] *Id.*
[92] *See id.* ("[A]bsent from the WEP exception is a requirement that the 'service' be only in a non-civilian or military duty capacity.").

further agree that certain aspects of a dual status technician's employment may ultimately be performed as a member of a uniformed service.[93] Given the dual nature of the role and the civilian elements we have discussed, however, we cannot agree that the employment is performed wholly as a member of a uniformed service. We must instead hold that the uniformed services exception does not apply in Martin's case.

## V.

We affirm the judgment of the district court.

---

[93] For example, the portion of dual status technician employment that requires "[s]upport of operations or missions undertaken by the member's unit at the request of the President or Secretary of Defense" arguably overlaps with the technician's National Guard duties, as we have discussed. *See* 32 U.S.C. §§ 502(f)(1)(2)(A), 709(a)(3)(A).